## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Anthony Kramer, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>v.<br><br>CenturyLink, Inc., CenturyTel Broadband Services, LLC, CenturyLink Communications, LLC, CenturyLink Public Communications Inc., CenturyLink Sales Solutions, Inc., CenturyTel of Minnesota, Inc., PTI Communications of Minnesota, Inc., Embarq Minnesota Inc., Qwest Broadband Services, Inc., and Qwest Corporation.<br><br><br>                Defendants. | Case No: _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Anthony Kramer, individually and as the representative of a class of similarly situated persons, through the undersigned counsel, alleges as follows:

### NATURE OF THE CASE

1.      This case arises from CenturyLink's misleading and deceptive conduct in adding unauthorized charges to customer accounts. CenturyLink promises simple, low teaser rates to Minnesota customers for telephone and internet service. After signing up, customers are soon confronted with unexplainable increases and fraudulent fees on their monthly bills. As detailed below, Defendants' actions violated applicable consumer

1

protection states, breached customer contracts, violated the duty of good faith and

dealing, and resulted in CenturyLink being unjustly enriched at the expense of its

customers. Plaintiff's requested relief of an accounting by Defendants and a refund for all

overcharges is necessary and appropriate.

## PARTIES

2.     Plaintiff Anthony Kramer ("Kramer") is a citizen of Minnesota and resides

in St. Paul, Minnesota. Plaintiff is a qualified and appropriate representative of the

Minnesota Class (defined below) who are similarly situated and have suffered injury in

the same manner as Plaintiff because of Defendants' unlawful conduct alleged herein.

3.     Defendant CenturyLink, Inc. is a Louisiana corporation doing business in

Minnesota. CenturyLink is a large provider of communications and data services to

residential, business, governmental, and wholesale customers throughout the United

States, including Minnesota.

4.     Upon information and belief, the following Defendants are all direct or

indirect subsidiaries and/or affiliates and either directly or indirectly controlled by

CenturyLink, Inc. All profits of these subsidiaries, including those obtained from the

practices complained of herein, are eventually up-streamed to CenturyLink, Inc., and

reported on its financial statements. CenturyLink, Inc. and the following entities are

hereinafter collectively referred to as "Defendants" or "CenturyLink."

> a) Defendant CenturyTel Broadband Services, LLC is a Louisiana limited
>    liability company, doing business in Minnesota as CenturyLink
>    Broadband.

b) Defendant CenturyLink Communications, LLC is a Delaware limited liability company doing business in Minnesota.

c) Defendant CenturyLink Public Communications Inc. is a Minnesota corporation.

d) Defendant CenturyLink Sales Solutions, Inc. is a Delaware corporation doing business in Minnesota.

e) Defendant CenturyTel of Minnesota, Inc. is a Minnesota corporation.

f) Defendant PTI Communications of Minnesota, Inc. is a Minnesota corporation.

g) Defendant Embarq Minnesota Inc. is a Minnesota corporation.

h) Defendant Qwest Broadband Services, Inc., is a Delaware corporation, doing business in Minnesota as CenturyLink.

i) Defendant Qwest Corporation is a Colorado corporation, doing business in Minnesota as CenturyLink QC.

5.      At all material times, Defendants have maintained authority to transact business and Minnesota and have maintained operations throughout Minnesota.

6.      All Defendants conduct business in Minnesota as "CenturyLink" and hold themselves out to the public as "CenturyLink." All Defendants use the same common logos and trademarks in letters, billings, marketing, and advertisements directed to the public. This shared branding makes it difficult and confusing for the public, including Plaintiff and Class Members, to discern which Defendant they are dealing with.

7.      Upon information and belief, each Defendant was the agent of each of the remaining Defendants, and was at all times herein mentioned acting within the course, scope, purpose, consent, knowledge, ratification, and authorization of and for such agency.

3

8.     Upon information and belief, CenturyLink, at all relevant times, completely dominated and controlled the other Co-Defendants. Whenever and wherever reference is made in this Complaint to any conduct by Defendant or Defendants, such allegations and references shall also be deemed to mean the conduct of each of the Defendants, acting individually, jointly, and severally.

## JURISDICTION AND VENUE

9.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d) because the matter in controversy, exclusive of interest and costs, exceeds the sum of $5,000,000 in the aggregate and proposed Class Members are citizens of a state different from Defendants.

10.     This Court has personal jurisdiction over Defendants because Defendants are authorized to and do in fact conduct substantial business in the state of Minnesota. Defendants have sufficient minimum contacts with this District and intentionally avails itself of the markets in Minnesota through the promotion, marketing, and sale of various telecommunication services to render the exercise of jurisdiction by this Court permissible.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this jurisdiction as Defendants: (a) are authorized to conduct business and have intentionally availed themselves to the laws within this District; (b) currently conduct substantial business in this District, having multiple offices and physical locations throughout Minnesota; and (c) are subject to personal jurisdiction in this District.

## FACTS

12.     On June 14, 2017, former CenturyLink employee Heidi Heiser filed a whistleblower complaint in the Superior Court of Arizona for Maricopa County alleging that she was terminated for reporting to her supervisors and the CEO about the unlawful billing practices she observed yet refused to take part in as a sales representative. *See Heiser v. CenturyLink, Inc.*, No. 17-cv-02333-DGC (D. Ariz.) (following removal).

13.     As explained in the *Heiser* complaint, Defendants maintain incentive programs for their employees and agents that provide financial incentives to charge customers for services they did not order, or to overcharge customers for services they did order.

14.     For example, Ms. Heiser alleges that "multiple CenturyLink customers were being designated as having additional accounts that they informed Ms. Heiser they did not request or approve." Heiser Compl. ¶ 13. According to Ms. Heiser, CenturyLink allowed persons to add unauthorized services or lines, "which would then inure to the direct or indirect benefit of such CenturyLink agents or their superiors," as well as CenturyLink. *Id.* ¶ 15.

15.     As noted in the *Heiser* complaint, when customers complained about unauthorized lines or services, "CenturyLink's policy was generally to inform the complaining customer that CenturyLink's system indicated the customer had approved the service . . . and to therefore demand payment for any such extra services through the date of the complaint, and to only rectify the problem on a going-forward basis." *Id.* ¶ 19. Instead of upholding their duty to act in good faith and to ensure that they accurately bill

consumers for services actually authorized, Defendants have shifted that burden to consumers to locate the overcharges and then demand refunds.

16.     According to Ms. Heiser, CenturyLink managers were well aware of these problems because "the customer complaints related to unauthorized services and charges were so prolific." *Id.* ¶ 20. In fact, it became clear to Ms. Heiser that CenturyLink management created incentives that encouraged CenturyLink agents to add unauthorized lines and services to customer accounts, noting that these same managers "were knowingly and intentionally ignoring the customer complaints about such practices and enforcing policies that allowed CenturyLink to keep payments received on unauthorized charges and to encourage more such payments." *Id.* ¶ 22.

17.     Ms. Heiser's allegations of what she observed, and what the CenturyLink corporate culture encouraged, are consistent with the experiences of thousands of consumers who have been misled by CenturyLink. Upon information and belief, Ms. Heiser's experience is not unique. Multiple other CenturyLink employees, including those who have worked or work at various CenturyLink call centers, have had similar experiences to Ms. Heiser's.

18.     Many current and previous CenturyLink customers, including Minnesota consumers, have posted messages on social media and consumer watchdog websites, describing the type of deceptive and unlawful conduct described in the *Heiser* complaint. For example, the following consumer complaints is emblematic of CenturyLink's practices:



Yelp Reviews, CenturyLink Store, https://www.yelp.com/biz/centurylink-store-minneapolis-4 (last visited Oct. 25, 2017).

19.    On another consumer review website, hundreds of complaints point to CenturyLink's dishonest billing practices. Some examples of Minnesota consumer complaints include the following:



Minnesota CenturyLink Reviews and Complaints @ Pissed Consumer,
https://centurylink.pissedconsumer.com/state/minnesota.html (last visited Oct. 25, 2017).

      20.     Google reviews on one of CenturyLink's Minneapolis locations echo

similar sentiments:




# CenturyLink
200 S 5th St, Minneapolis, MN



1.4 ★★☆☆☆   100 reviews

Sort by: **Most helpful**



**Blake Smith**
3 reviews

 ★☆☆☆☆   a month ago - ⚑

THE WORST!!!  I have spent over four hours on the phone with costumer service over the past 3 weeks. Each week the call was concluded with the problem with billing seemingly sorted out.... until we received the next bill.  The last call in ... More

 4

**Joshua Hanson**
1 review

★☆☆☆☆   3 months ago

Do not use them!!!!  Worst company in the state.  ordered service...  never received service!  THEN to top it off they billed me.  Refused to drop it and put it into collections.  Had to get the secretary of state involved to get it resolved.  2 years later they put it back into collections.  I have to contact the secretary of state again now

 3

**Erik Ordal**
5 reviews

 ★☆☆☆☆   a month ago - ⚑

Is it possible to give zero stars?  I've now spent hours and hours on the phone with CenturyLink.  All I'm doing is trying to pay my bill (which happens to be $50 higher/month than it was quoted at).  After a 55 minute call today, I've had enough.  Every call I make is forwarded on to the next "person that can help me."  The last call I had the agent said that I've been talking to people on the "wrong side of the Company."  Seriously, CenturyLink?  At every stop I ask for the manager to no avail.  Come pick up your boxes from my place CenturyLink -- I'd rather have no TV or internet than continue to try and call you to pay my stinkin' bill!

 3

Google Search, https://www.google.com/search?q=centurylink (under Google reviews for 200 S. 5th St. Minneapolis, MN 55402 location) (last visited Oct. 25, 2017).

21.     The Better Business Bureau ("BBB") has also identified a pattern of consumer complaints regarding CenturyLink's deceptive billing practices. Complaints are so rampant that the BBB has issued a warning:

> CenturyLink consumers are alleging sales practice issues with this business. They state they are often charged more than the price they agreed to when signing up for the service, and that they do not receive the speed and quality that is promised by sales representatives. BBB has also received several complaints regarding customer service issues, specifically that the business is not responsive to their questions or concerns, or will offer to reduce rates but the customers tell BBB the reduction does not go into effect on their bills. One consumer explained that they have contacted CenturyLink 47 times since signing up in order to have the overcharge fixed, but the bill has not reflected an adjustment.

Better Business Bureau, BBB Warning: CenturyLink, https://www.bbb.org/denver/news-events/news-releases/2017/01/bbb-warning-centurylink/ (last visited Oct. 25, 2017).

22.     The ConsumerAffairs.com website also contains numerous complaints about CenturyLink, and specifically regarding CenturyLink's deceptive billing practices, which can be found at https://www.consumeraffairs.com/cell_phones/centurylink.html.

23.     The foregoing websites contains many similar complaints regarding CenturyLink's billing practices, which collectively demonstrate a pattern and practice of Defendants' violations of applicable consumer protection states, breach of contracts, breach of good faith and dealing, and unjust enrichment at the expense of its customers.

24.     Further, searching Twitter and Facebook with the word "CenturyLink" and any number of additional keywords—"scam," "fraud," "ripoff," and "bill"—provides significant levels of discord, desperation, and demands from victims to remedy CenturyLink's unlawful practices. A Google search of "CenturyLink Complaints," provides similar results.

25.     Defendants asserted that customers were responsible for alerting CenturyLink to any overbilling, and that they were required to report any billing disputes within three months. Upon information and belief, CenturyLink would not immediately

honor a request for a refund of any overpayment if it was not within the past three months.

26.     Many customers grew so frustrated with CenturyLink that they terminated CenturyLink's services, only to be threatened with or face an "early termination fee" that was required to be prorated on terms at CenturyLink's sole discretion.

27.     Additionally, CenturyLink obscured and misrepresented fees that would be charged, assessing an "Internet Cost Recovery Fee" or a "Broadband Recovery Fee" on customer billing records to make it appear like a government-mandated tax or other regulated fee, when in fact it was not. Rather, it was part of CenturyLink's monthly recurring internet service fees, deceptively separated out from any promotional rate to make promotional base rates appear lower to customers.

28.     Upon information and belief, at least one state's Attorney General has investigated and entered into an "assurance of discontinuance" with CenturyLink which prohibits the conduct described herein, including billing consumers at higher rates than represented. *See Approval of Assurance of Discontinuance, In the Matter of Qwest Corp. d/b/a CenturyLink QC*, No. CV 2016-002842 (Sup. Ct., Maricopa Cty., Ariz., April 13, 2016). Nonetheless, CenturyLink has continued its unlawful conduct.

29.     Other states' Attorneys General have commenced actions or investigations into Defendants' practices, including one by the Minnesota State Attorney General. *State of Minnesota, by its Attorney General, Lori Swanson v. CenturyTel Broadband Svcs. LLC, et al.*, No. 02-CV-17-3488, Complaint (Minn. Dist. Ct., Anoka Cty, July 12, 2017).

30.     The sheer volume and consistency of the overcharges and unauthorized accounts demonstrates that Defendants' conduct cannot be explained as isolated incidents or simple mistakes. Defendants exploited unsuspecting consumers who had placed their trust in Defendants to bill them accurately, honestly, and to withdraw from their financial accounts only amounts due and agreed to. Despite their duty to bill consumers only for amounts actually authorized, Defendants attempt to shift the burden to the consumers to locate overcharges and then demand refunds within a short time frame.

31.     These false charges include, but are not limited to: (1) lines or items consumers did not request, (2) higher rates than originally quoted, (3) early termination fees when cancellation was due to the higher rates or misrepresented service quality, (4) billing for periods before service was connected or products received, (5) charges for periods of service due to CenturyLink's failure to process cancellations in a timely manner, and (6) billing full price for leased modems returned to CenturyLink within the required timeframe.

32.     The amounts billed to each consumer each month are relatively small (less than $200) and therefore, Defendants know that certain consumers will have little time to actively monitor and immediately seek corrections when appropriate. Defendants attempt to take advantage and exploit this. This type of catch-us-if-you-can policy is unfair, deceptive, and misleading.

33.     The types of deceptive practices described above have affected and continue to affect Plaintiff and Class Members of other CenturyLink subscribers in Minnesota.

*Plaintiff Kramer's Personal Experience with CenturyLink*

34.     Plaintiff Kramer has been a customer of CenturyLink since 2013 and continues to be overcharged for services by CenturyLink.

35.     At all relevant times, Mr. Kramer has been a customer and subscriber of CenturyLink for internet services.

36.     When Kramer first signed up, CenturyLink informed him that he would receive a $10 discount for bundling DirecTV television services. He was quoted and agreed to pay approximately $35-40 per month.

37.     Rather than honor this agreement, CenturyLink increased his monthly rate to over $60. Kramer did not notice the rate increase at first because his account was on auto-pay.

38.     CenturyLink did not give Kramer the bundling discount as represented. It was only after Kramer had emailed CenturyLink and called them multiple times, did he finally get the bundling discount he was promised.

39.     CenturyLink has steadily increased Kramer's monthly rate multiple times without explanation or notice over the years.

40.     In June 2017, CenturyLink again increased Kramer's rate from $67.99 to $68.99 without any explanation or prior notice. After noticing that CenturyLink's automatic debits from his credit card account had increased yet again, Kramer contacted CenturyLink once more. CenturyLink offered to waive the September 2017 bill and lowered the monthly rate to $36.49, effective October 2017.

41.     CenturyLink never refunded the full amount it wrongfully took from Kramer.

42.     In addition, the speed and quality of CenturyLink's internet service has not been what CenturyLink represented. In recent months, evening data speeds  are drastically slower.

43.     Further, CenturyLink continues to charge Kramer an "Internet Cost Recovery Fee." Kramer's monthly statements contain no description that explains what this fee is nor was this fee ever disclosed to him at the time he signed up.

44.     CenturyLink's misconduct toward Kramer was not merely an isolated incident, an accident, or technical error. Instead, Kramer was swept up into CenturyLink's systematic scheme to breach contracts and defraud consumers out of money through its false invoicing and collection practices. CenturyLink's conduct was deliberately calculated to cause confusion and deceive its customers in similar circumstances as Kramer.

45.     Kramer has paid CenturyLink unauthorized charges and has been damaged and incurred pecuniary loss because of CenturyLink's unlawful common practices.

## CLASS ACTION ALLEGATIONS

46.     This action is brought, and may properly be maintained, as a class action under Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

47.     The Class is defined to include: "Any person or public or private entity, who contracted with Defendants for telephone, television, or internet service in the state

of Minnesota during the relevant Class Period" (referred to herein as the "Class" or
"Class Member(s)").

48.    The "Class Period" for the Class dates back to the length of the longest
applicable statute of limitations for any claims asserted on behalf of that Class from the
date this action was commenced and continues through the present and the date of
judgment.

49.    Excluded from the Class are Defendants, their current employees, co-
conspirators, officers, directors, legal representatives, heirs, successors and wholly or
partly owned subsidiaries or affiliated companies; the undersigned counsel for Plaintiff
and their employees; and the judge and court staff to whom this case is assigned. Plaintiff
reserves the right to amend the definition of the Class if discovery or further investigation
reveals that the Class should be expanded or otherwise modified.

50.    This action satisfies the predominance, commonality, typicality,
numerosity, superiority, adequacy, and all other requirements of Rule 23 of the Federal
Rules of Civil Procedure.

- **Numerosity**: The Class is so numerous that the individual joinder of all
  members is impractical under the circumstances of this case. While the
  exact number of Class Members is currently unknown to Plaintiff,
  Plaintiff is informed and believes, and based thereon alleges, that
  thousands of consumers have been victimized by CenturyLink's practices
  in Minnesota, in the manner described above.

15

- **<u>Commonality</u>**:  Common questions of law and fact exist as to all members of the Class and predominate over any questions that affect only individual members of the Class. The common questions of law and fact include, but are not limited to:

    i.  Whether Defendants made misrepresentations or omissions of material fact about their telecommunications services, billings, and/or employee incentive programs;

    ii.  Whether Defendants maintained incentive programs which encouraged employees and agents to overcharge Class members for services Class Members did not order or approve;

    iii.  Whether Defendants engaged in a practice or act with intent to sell, distribute, increase the consumption of their services, or with intent to induce the public in any manner to enter into any contract or obligation relating to their services, made, published, disseminated, circulated or otherwise placed before the public an advertisement, announcement, statement or representation of any kind to the public relating to such services or to the terms or conditions thereof, which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading;

    iv.  Whether Defendants maintained a program of shifting responsibility to its customers to discover the overcharges as opposed to billing and collecting fees from consumers accurately and in good faith;

    v.  Whether Defendants engaged in a practice or act that they knew or reasonably should have known is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact related to the advertisement, sale, or lease of equipment and telephone and internet services;

    vi.  Whether Defendants intended to cause confusion or misunderstanding among consumers regarding the prices of telecommunications services and whether Defendants intended not to honor its quoted prices;

vii.    Whether Defendants maintained contracts with hidden or undisclosed terms requiring consumers to discover overcharges within a certain amount of time, without regard to whether such charges were permissible or allowed by law;

viii.    Whether Defendants made misrepresentations or omissions of material fact about their quoted monthly prices and the nature of their telecommunications services and billings;

ix.    Whether Defendants breached implied or explicit contractual obligations to subscribers or deceptively billed for services not being offered, not contemplated, or not agreed upon;

x.    Whether Defendants breached the implied covenant of good faith and fair dealing made part of all contracts;

xi.    Whether Defendants should be required to conduct an equitable accounting and provide refunds;

xii.    Whether Plaintiff and the putative Class Members were harmed by Defendants' conduct; and

xiii.    Whether Defendants have been unjustly enriched.

- **Typicality**: Plaintiff's claims are typical of the claims of the Class Members. Plaintiff and the members of the Class sustained damages arising out of Defendants' wrongful and deceptive conduct as alleged herein.

- **Adequacy**: Plaintiff and the undersigned counsel will fairly and adequately protect the interests of the Class Members. Plaintiff has no interest that is adverse to the interests of the other Class Members and has hired counsel experienced in class actions and complex litigation.

- **Superiority**: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Because individual

17

joinder of all Class Members is impractical, class action treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of effort and expense that numerous individual actions would engender. The expenses and burdens of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while important public interests will be served by addressing the matter as a class action. The cost to, and burden on, the court system of adjudication of individualized litigation would be substantial, and significantly more than the costs and burdens of a class action. Class litigation will also prevent the potential for inconsistent or contradictory judgments.

## COUNT I
## Violations of Minnesota's Consumer Fraud Act
## Minn. Stat. §§ 325F.69, *et seq.*

51.    Plaintiff incorporates each paragraph of this Complaint as if set forth fully herein, and further alleges as follows.

52.    Plaintiff brings this action on behalf of himself and on behalf of Class Members against Defendants for violations of the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69 ("CFA").

53.    The CFA prohibits "[t]he act, use, or employment by any person of fraud, false pretenses, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any

merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby…" Minn. Stat. § 325F.69, subd. 1.

54.     CenturyLink, Plaintiff, and Class Members are all "person[s]" under § 325F.68, subd. 3 of the CFA.

55.     CenturyLink's sale of goods and services related to internet, cable, and telephone constitutes "merchandise" under Minn. Stat. 325F.68, subd. 2.

56.     CenturyLink, through employees and agents, has repeatedly violated the CFA by engaging in the deceptive and fraudulent advertising, billing, and collections practices described in this Complaint.

57.     CenturyLink's unlawful acts and practices alleged herein affect the public interest. Among other things, this action is brought to punish Defendant and to deter Defendant and other parties from engaging in wrongful conduct that is harmful to the public.

58.     Defendants employed a pattern and practice of fraudulent conduct, misrepresentations, and material omissions of fact regarding its services including, but not limited to, billing Plaintiff and Class Members rates higher than what was quoted and billing Plaintiff and Class Members for inapplicable fees, inappropriate services, and incorrectly bundled packages.

59.     CenturyLink implemented a scheme to lure Plaintiff and Class Members with low teaser rates but then later charged higher than promised rates and fees. Defendants relied on consumers' use of automatic deductions from their financial accounts to keep its previously undisclosed fees hidden. Defendants kept the overcharges

to relatively small amounts (under $200) knowing that certain customers will have little time to actively monitor and immediately seek corrections. Defendants sought to exploit this dynamic.

60.     Plaintiff and Class Members need not establish individual reliance on Defendants' affirmative misrepresentations to establish entitlement to damages flowing from violations of law prosecutable under Minn. Stat. § 8.31, subd. 3a, including the CFA.

61.     Plaintiff may demonstrate class-wide damages by establishing a causal nexus between any conduct in violation of Minnesota's consumer protection statutes and injury through circumstantial evidence not related to any particular Class Member. There is a causal nexus between Defendants' misrepresentations as to the monthly rate for services which induced Plaintiff and Class Members into a relationship with Defendants whereby Defendant was permitted to implement its scheme of tacking on inappropriate fees and charges on Plaintiff and Class Members' monthly statements.

62.     Due to the deceptive and fraudulent conduct described in this Complaint, Plaintiff and Class Members have made payments to CenturyLink for goods and services that they otherwise would not have purchased or in amounts that they should not have been required to pay, thereby causing harm to them. For all material omissions of information, causation is presumed.

63.     Plaintiff and the Class lost money and were injured and harmed by Defendants' deceptive, unconscionable, and/or unfair business practices in amounts to be determined at trial.

64.     As a result, Plaintiff and the Class are entitled to injunctive and declaratory relief, among other things, compensatory damages, any statutory damages, and penalties permitted by law, an accounting, and all other relief deemed just and equitable by the Court, including but not limited to reasonable attorneys' fees and costs, consistent with Minn. Stat. § 8.31, subd. 3a.

## COUNT II
### Violations of the Minnesota Deceptive Trade Practices Act
### Minn. Stat. §§ 325D.44, *et seq.*

65.     Plaintiff incorporates each paragraph of this Complaint as if set forth fully herein, and further alleges as follows.

66.     Plaintiff brings this action on behalf of himself and Class Members against Defendants for violations of the Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44 ("DTPA") based on Defendants' deceptive and misleading conduct and common omissions of material fact.

67.     Minn. Stat. § 325D.44, subd. 1 defines the following as deceptive trade practices:

- Representing that goods or services characteristics have characteristics, uses, or benefits they do not;

- Representing that goods or services are of a particular standard, quality, or grade, if they are of another;

- Advertising goods or services with intent not to sell them as advertised;

- Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions.

Minn. Stat. §§ 325D.44, subd. 1(5), (7), (9), (11).

68.     As alleged above, Defendants, through their employees and agents, have

engaged in a pattern and practice of deceptive and misleading activity, and collection of

monies by way of false pretenses. Defendants engaged in deceptive, unconscionable,

and/or unfair business practices by, among other things, causing the members of the

Class to be signed up for services they did not request or authorize, billing at higher rates

than those quoted, billing for early termination fees, continuing to bill Class Members

after they canceled their accounts, and adding charges and requiring consumers to pay for

previously undisclosed and unadvertised fees in connection with Defendants' services,

and substituting services of lower quality.

69.     The amounts charged, collected, and auto-deducted from bank or other

financial accounts (or otherwise billed and collected) are material terms to Class

Members. Deceptively overcharging Class Members in a manner they are unlikely to

detect is a material misrepresentation or an omission of material fact to Members of the

Class.

70.     As explained in the *Heiser* complaint, the foregoing occurred and injured

Class Members because Defendants maintained an incentive program for their employees

and agents which provided financial incentives to them to engage in such conduct.

71.     Defendants' conduct described herein were likely to deceive a consumer

acting reasonably in the same circumstances.

72.     Defendants acted with the intent that Plaintiff and Class Members would

rely on their concealment, suppression, or omission, in connection with the sale or

advertisement of any merchandise and therefore Defendants engaged in unlawful practices in violation of the DTPA.

73.     Defendants kept the overcharges to relatively small amounts (under $200) knowing that certain customers would have little time to actively monitor and immediately seek corrections. Defendants sought to exploit this dynamic.

74.     Defendants made their untrue, false and deceptive representations concerning their telecommunications services with the intent to induce Plaintiff and Class Members to purchase Defendants' services in violation of the DTPA.

75.     Defendants' representations materially induced Plaintiff's decision and the decisions of Class Members to purchase services from CenturyLink.

76.     Plaintiff and the Class lost money and were injured by Defendants' deceptive, unconscionable, and/or unfair business practices in amounts to be determined at trial.

77.     The conduct described herein is continuing. The conduct was done for profit as a deliberate corporate policy rather than as an isolated incident, and was morally wrong, callous, and/or oppressive.

78.     As a result, Plaintiff and the Class are entitled to injunctive and declaratory relief and all other relief deemed just and equitable by the Court, including but not limited to reasonable attorneys' fees and costs, consistent with Minn. Stat. § 8.31, subd. 3a.

<u>**COUNT III**</u>
<u>**Violations of the Minnesota Unlawful Trade Practices Act**</u>
<u>**Minn. Stat. §§ 325D.13, *et seq.***</u>

79.     Plaintiff incorporates each paragraph of this Complaint as if set forth fully here, and further alleges as follows.

80.     Plaintiff brings this action on behalf of himself and Class Members against Defendants for violations of the Minnesota Unlawful Trade Practices Act, Minn. Stat. § 325D.13 ("UTPA") based on Defendants' fraudulent business acts and practices.

81.     Minn. Stat. § 325D.13 prohibits a person, in connection with the sale of merchandise, to knowingly misrepresent, directly or indirectly, the true quality of such merchandise.

82.     CenturyLink is a "person" within the meaning of Minn. Stat. § 325D.10.

83.     CenturyLink, through its employees and agents, violated the UTPA by misrepresenting its billing and sales practices. CenturyLink frequently billed Plaintiff and Class Members at rates higher than originally quoted, and inappropriately billed Plaintiff and Class Members for unauthorized services, inapplicable fees, and incorrectly bundled services.

84.     CenturyLink represented to Plaintiff and Class Members certain prices for its goods and services but then regularly charged them higher rates than originally promised.

85.     Defendants acted with the intent that Plaintiff and Class Members rely on their concealment, suppression, or omission, in connection with the sale or advertisement

of any merchandise and therefore engaged in unlawful practices in violation of the UTPA.

86.     Defendants kept the overcharges to relatively small amounts (under $200) knowing that certain customers would have little time to actively monitor and immediately seek corrections. Defendants sought to exploit this dynamic.

87.     As a result, Plaintiff and the Class are entitled to injunctive and declaratory relief, among other things, compensatory damages, any statutory damages, and penalties permitted by law, an accounting, and all other relief deemed just and equitable by the Court, including but not limited to reasonable attorneys' fees and costs, consistent with Minn. Stat. § 8.31, subd. 3a.

## COUNT IV
## Breach of Contract

88.     Plaintiff incorporates each paragraph of this Complaint as if set forth fully herein, and further alleges as follows.

89.     Plaintiff and Class Members were parties to actual or implied contracts with Defendants for the provision of telephone, internet, television, and/or other telecommunication services at certain costs. Plaintiff and Class Members performed under the contracts.

90.     As explained above, Defendants maintained a program for their employees and agents that provided financial incentives if they charged customers for services Class Members did not order and/or overcharged Class Members for services they did order.

91.     Defendants overcharged Plaintiff and Class Members in breach of their contracts.

92.     Plaintiff and Class Members were injured and incurred financial loss due to Defendants' conduct in amounts to be determined at trial.

93.     As a result, Plaintiff and Class Members are entitled to various relief, including but not limited to compensatory damages, an accounting, and all other relief deemed just and equitable by the Court.

## COUNT V
## Breach of Duty of Good Faith and Fair Dealing

94.     Plaintiff incorporates each paragraph of this Complaint as if set forth fully herein, and further alleges as follows.

95.     Minnesota law implies a duty of good faith and fair dealing in every contract.

96.     Defendants had a duty to treat Plaintiff fairly, and to accurately bill, collect, and account for funds mutually agreed upon.

97.     Defendants owed Plaintiff and Class Members an additional duty to not abuse its powers to charge excessive and unauthorized fees, or otherwise convert Plaintiff and Class funds, due to Defendants' ability to automatically debit funds from Plaintiff and Class Members' financial accounts.

98.     By Defendants' actions, Defendants breached that duty and acted unfairly and in bad faith.

99.    Accordingly, Plaintiff and Class Members are entitled to various relief, including but not limited to compensatory damages, an accounting, and all other relief deemed just and equitable by the Court.

## COUNT VI
### Accounting

100.    Plaintiff incorporates each paragraph of this Complaint as if set forth fully herein, and further alleges as follows.

101.    Defendants had a duty to accurately charge, collect, and deduct from Plaintiff's and Class Members' financial accounts only amounts mutually agreed to.

102.    Defendants maintained one or more incentive programs for their employees and agents which provided financial incentives to charge customers for services they did not authorize and/or to overcharge Class Members for services they did order.

103.    Defendants maintained a system of overcharging and collecting from Plaintiff and Class Members monies they did not agree to pay.

104.    As a result, Defendants received money, a portion of which is due to Plaintiff and the Class.

105.    The amount of money due from Defendants to Plaintiff and the Class is currently unknown to Plaintiff and cannot be ascertained without an accounting of the receipts and disbursements of Class Members' transactions and accounts with Defendants. Plaintiff on behalf of the Class, therefore demands an accounting of the aforementioned transactions from Defendants and demands payment of the amount found

27

due which Defendants have failed and refused—and continue to fail and refuse—to pay. Such an accounting should be conducted at Defendants' sole cost and expense.

106.   Defendants maintained sole custody and control of their accounting and billing systems. Defendants also had exclusive access to the internal incentive programs offered to their agents and employees. Many Class Members agreed to have Defendants automatically deduct payments from their financial accounts, placing trust in Defendants to only bill them amounts that Class Members agreed to pay. Defendants had a special relationship with Plaintiff and the Class and therefore had a duty to account accurately for the amounts charged and collected for services provided.

107.   Defendants failed to meet the requirements in their agreements with Plaintiff and Class Members with regard to billing and collecting sums. Plaintiff and the Class Members trusted and relied on Defendants to bill them accurately and only collect amounts properly due. Many Class Members unsuspectingly authorized automatic payments and withdrawals. There is a widespread problem with overbilling and inaccurate collections by Defendants which requires review and oversight.

108.   An accounting and audit is necessary. A balance due from the Defendants to Plaintiff and the Class can only be ascertained through such an accounting.

109.   Given their superior knowledge and access to records, as well as their duty to only bill and collect monies in good faith, Defendants are in the superior and exclusive position to confirm the accuracy of their accounts and collections from Class Members and provide refunds.

110.    Defendants should be ordered to provide an accounting of each Class Member's account, to ensure that each Class Member has not been overcharged. To the extent they have been overcharged (as with Plaintiff), Defendants should be ordered to immediately refund the difference with interest, along with all other relief found just and equitable in the premises, including but not limited to reasonable attorneys' fees and costs.

**COUNT VII**
**Unjust Enrichment**

111.    Plaintiff incorporates each paragraph of this Complaint as if set forth fully herein, and further alleges as follows.

112.    Due to Defendants' unlawful and deceptive practices described above, Defendants have been unjustly enriched in retaining revenue derived from Plaintiff and Class Members' payments for Defendants' services.

113.    Retention of that revenue under these circumstances is unjust and inequitable because Defendants used illegal, deceptive, and unfair business practices to induce or force customers to open, purchase, and/or maintain services and products.

114.    Retention of that revenue under these circumstances is also unjust and inequitable because Defendants used illegal, deceptive, and unfair business practices to bill customers for services neither requested nor provided.

115.    Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and Class Members is unjust and inequitable, Defendants must pay

restitution to Plaintiff and Class Members for their unjust enrichment, along with all other relief found just and equitable, including reasonable attorneys' fees and costs.

## REQUESTED RELIEF

Plaintiff, on behalf of himself and Class Members, requests that this Court:

1. Certify this action as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure,

2. Appoint Plaintiff as representative of the Class,

3. Appoint Plaintiff's counsel as Class Counsel;

4. Enter judgment in favor of Plaintiff and the Class against Defendants under the legal theories alleged herein;

5. Declare that Defendants' conduct violates the statutes and other legal counts referenced herein;

6. Issue an order enjoining Defendants from continuing their unlawful, deceptive marketing and billing practices and described herein;

7. Award all actual, consequential, statutory, and incidental losses and damages, according to proof;

8. Order an accounting;

9. Award reasonable attorneys' fees, expenses and costs of suit, as permitted by law;

10. Award pre-judgment interest on all amounts awarded; and

11. Award any other relief this Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiff, on behalf of himself and the Class, hereby demand a trial by jury.

Dated:   November 3, 2017                     Respectfully submitted,

_s/ Daniel C. Hedlund_____
Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
David A. Goodwin (#386715)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
Email:   dgustafson@gustafsongluek.com
              dhedlund@gustafsongluek.com
              dgoodwin@gustafsongluek.com

***Attorneys for Plaintiff***